IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39849-8-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ALEX BALMORE CASTRO, | ) | |
| | ) | |
| Appellant. | ) | |

MELNICK, J.P.T.[1] — A jury found Alex Castro guilty of two counts of first degree

child rape and two counts of first degree child molestation, with aggravating factors.

The trial court imposed an exceptional sentence above the standard range. It also

imposed a $500 crime victim penalty assessment (CVPA) and $100 DNA collection fee.

---

[1] Rich Melnick, a retired judge of the Washington State Court of Appeals, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).

No. 39849-8-III
*State v. Castro*

Castro appeals, arguing that the State committed numerous instances of prosecutorial misconduct in its closing argument and rebuttal closing argument. We conclude that the State did make some improper arguments but, individually and cumulatively, the arguments either did not prejudice Castro or they could have been cured with a jury instruction. We affirm the convictions but remand for the trial court to strike the CVPA.

## FACTS[2]

VW raised her granddaughter, FL, for the first five years of her life. FL then lived with her mother, ML. In 2014, ML met Alex Castro. She and FL, at the age of five, moved in with Castro shortly thereafter. ML and Castro had a son together in July 2015. Around that time, the romantic relationship ended between ML and Castro. ML and FL moved out in November 2015.

FL had a close relationship with Castro and called him "daddy" or "dad." 1 Rep. of Proc. (RP) (Mar. 27, 2023) at 63; 2 RP (Mar. 30, 2023) at 585, 648. FL would often stay with Castro, at his residence, after she and ML moved out.

---

[2] All of Castro's allegations of impropriety involve the State's closing argument and rebuttal closing argument. We include the contested comments necessary to resolve this case, and only those facts that are necessary to put the closing arguments in context.

During the summer of 2017, FL, then seven years old, visited her grandmother in Idaho and disclosed sexual abuse by Castro. After an investigation, the State charged Castro with two counts of child molestation. The state later amended the information to add two counts of first degree rape of a child.

The matter proceeded to trial in March 2023 when FL was 13 years old. She testified, and the jury heard details of sexual intercourse and molestations perpetrated on FL by Castro. They also viewed a recording of a forensic interview conducted with FL when she was seven years old. 2 RP (Mar. 29, 2023) at 558; Ex. 6. The jury heard testimony from ML that FL began acting up in school around the time she and ML moved out of their shared apartment with Castro, and that FL told her mother that she no longer wanted to see Castro.

In addition to other instances of sexual assault, FL described Castro humping her until something "gooey" came "from his private part." Ex. 6 at 19 min., 50 sec. to 20 min., 54 sec. She added that Castro regularly "peed" something "gooey" on the bed. Ex. 6 at 20 min., 55 sec. to 21 min., 10 sec. Castro would "let her" suck his fingers, but it "tasted weird." Ex. 6 at 24 min., 35 sec. to 24 min., 57 sec. FL also said Castro had her touch his penis with her hand and mimicked how he grabbed her wrist and moved her hand onto him. Ex. 6 at 53 min., 10 sec. to 53 min., 33 sec. She further testified that

3

Castro would pick his mom's cat up and try to make it lick his penis. Ex. 6 at 48 min., 57 sec. to 49 min., 10 sec. The jury also heard from ML, VW, and the investigating detective.

Castro also testified. He denied all sexual contact and intercourse with FL, but did admit she began sleeping in the bed with him when she started staying the night at his house. Castro further testified that, in the months leading up to his breakup with ML, he believed he had a heart attack or stroke that caused him to be impotent; Castro provided no medical records or reports substantiating his claim. When the police interviewed Castro in 2017, he did not disclose this information despite acknowledging that he knew the police wanted to talk about the sexual assault allegations against him.

Castro told the jury that he did not have a cat and said that it was "strange and weird" that FL would say he touched a cat inappropriately. 2 RP (Mar. 30, 2023) at 640. When confronted with his 2017 police interview where he said he had a cat, Castro acknowledged making that statement to the police. When asked about the inconsistencies in his statements, Castro said that his mother, who had been living with him around that time, did have a cat.

*The State's closing argument*

In closing argument, the State addressed statements made by seven-year-old FL in

the forensic interview, and the trial testimony of VW and 13-year-old-FL, telling the jury:

> Over the course of this argument as I stand in front of you, I am going to argue to you that both of them are credible witnesses. And both of them should be believed. And between both of them and all the other evidence in this case, the State has proved this case beyond a reasonable doubt.

2 RP (Mar. 31, 2023) at 692-93.

The State then explained that for the jury to return verdicts of guilty, it had to prove the elements of each charged crime beyond a reasonable doubt. 2 RP (Mar. 31, 2023) at 693-98. The State reminded the jury that it had to consider all of the evidence submitted to it before reaching the verdict. The State transitioned into discussing witness credibility.

> *Did you think 13 year-old [FL] was a credible witness? Guess what? You all get to determine what credibility is. You get to determine whether the witnesses were being honest with you.* And thankfully the judge gives you an instruction to help you determine what credibility is.
> Arguably one of the most important instructions in these types of cases:  Credibility.

2 RP (Mar. 31, 2023) at 704-05 (emphasis added).

The prosecutor reviewed several of the factors the trial court instructed the jury it could consider in reviewing witness credibility. The State argued FL, her mother, and her grandmother had no motive to lie, had no bias toward Castro, and had no personal interest in the outcome.

5

In considering the statements made by seven-year-old FL during her 2017 forensic interview, the prosecutor argued that the statements were credible based, in part, on FL's use of detailed terms to describe sexual acts in a "way a seven year-old observes something that she fully does not understand." 2 RP (Mar. 31, 2023) at 709. The prosecutor highlighted several of FL's statements to make this point, including that FL testified Castro, "*Had her pull her clothes off but her shirt remains. Why give you that detail? Why even say that? Because that's what happened. She lived it.*" 2 RP (Mar. 31, 2023) at 708 (emphasis added).

In referring to the arm motion FL used during the forensic interview to mimic Castro, the prosecutor said:

> Do you guys remember this moment in the video? I think [the interviewer] asked her, did you ever have to touch or did you ever have to put your hand—I don't remember exactly what word. And she goes, oh, yeah. She takes her right hand, if I remember correctly, you can look at it. She puts it on her wrist and she moves her arm to the actual side of the chair. *That is a memory that you just cannot make up because that's what happened.* He grabbed her wrist and moved it to his penis. And she showed you how he did it, by grabbing her own wrist and moving it. *That is a body sensory memory, ladies and gentlemen.*

2 RP (Mar. 31, 2023) at 708-09 (emphasis added).

The prosecutor also argued that the specific types of sexual acts described by FL were consistent with child sexual abuse. In assessing credibility, the State talked about the

6

various statements made at trial about Castro having a cat.

> What about the cat? The old cat. If you're trying to get children comfortable with your body, with licking, with sucking the fingers and all of this stuff, you know, *the cat, oh, the cat, the cat, the cat doing these things. And to say he doesn't have a cat, what, the cat only stays in the room with his mom? Makes no sense. You have to lie about that.*

2 RP (Mar. 31, 2023) at 716-17 (emphasis added).

To further support that the State had met its burden of proof, the prosecutor argued that FL's behavioral problems at school were the result of the sexual abuse against her, and that Castro had the opportunity to sexually assault FL when she started sleeping at his house without her mother there. The State noted that, based on Castro's testimony, he had gone from having sex almost every day with ML to having none when their romantic relationship ended after their son's birth.

The State suggested a way for the jury to assess Castro's credibility.

> And how about the defendant's own testimony? I need you to think about something. The defendant knew exactly what this case was about. He was accused of raping, sexually assaulting a child. He admitted to the police that she would come over many times. Admitted to the police that when he was over there she would—when she was there she would spend the night in his bed.
> [The detective's] interview was about 50 minutes long. *I bet that there are some people in this community that would rather be accused of killing somebody, murdering somebody than raping a kid. Yeah.*
> And this man is in that interview and doesn't tell [the detective] anything about what he tells you yesterday. My stuff doesn't work.

Well, what? What? You can't ejaculate? You can't -- what? What's going on here? Makes no sense.

Can you imagine you're in a—arguably a reasonable person would be in an interview being accused of something like this and you would not—here's my doctors, here's my heart attack. Here's my everything. Here, here, there is no way I could have done this crime. No way. No way I could have ever hurt a kid, the kid I loved. Never. It doesn't work**.** *It's preposterous. It's so ludicrous* to think that now, what, six years later going to come in here and say that? I was too embarrassed. What? There is zero credibility with his testimony. *But that's what you do. That's what you have to say when you are caught. You have to come up with the most ridiculous lie.* Defendant is not a credible witness at all. It makes no sense.

2 RP (Mar. 31, 2023) at 718-19 (emphasis added).

The defendant did not object to any of the prosecution's closing argument.

*Castro's closing argument*

The defense began its closing argument by discussing the role of the jury in evaluating the evidence in light of the State's burden of proof. It then addressed the credibility of each of the State's witnesses.

In attacking the lead detective's credibility, the defense misleadingly argued that the detective did not record any of the interviews he conducted while investigating this case.

The State objected, stating that while they were not played for the jury or admitted into evidence, the detective testified that he recorded all of the interviews he conducted, except for the one with FL's grandmother. After the court sustained the State's objection,

the defense continued by stating, "You were not provided any of the interviews that he either recorded or didn't record." 2 RP (Mar. 31, 2023) at 725. The State objected again:

> Your Honor, I would ask that that last statement be struck. Counsel knows I cannot provide these interviews to this jury. He's arguing something that is not legal, not legal in the state of Washington. The State of Washington did not provide these witnesses the statements to this jury, it's all hearsay. For counsel to actually argue that to the jury the State of Washington didn't play these interviews for the jury, is unbelievable, number one, and the State could never provide them to the jury. I would ask that that statement be struck.

2 RP (Mar. 31, 2023) at 726.

After Castro's counsel declined to be heard on this objection, the court struck the statements by defense counsel regarding recordings and instructed the jury to disregard them.

Defense counsel also argued that the detective failed to fully investigate the case. He argued the detective should have gone to Castro's house to see its condition as well as to see if FL had any belongings there. He further argued that the detective should have tried to obtain DNA evidence from "underwear, bed sheets, covers, [or] blankets." 2 RP (Mar. 31, 2023) at 727.

Defense counsel concluded by arguing that the State did not meet its burden of proving each element of the crimes charged beyond a reasonable doubt.

*The State's rebuttal closing argument*

The State began its rebuttal closing by addressing defense counsel's improper

arguments that the court had both stricken and instructed the jury to disregard.

> *I want to hold up to you what's titled, Courtroom Handbook on Washington*
> *Ethics; okay? So for [defense counsel] to stand in front of the 14 of you and*
> *say, oh, the State didn't play those interviews for you and they could have,*
> *but they're keeping them for you. He knows that is wrong and that's not a*
> *proper argument and not legal because I can't. You know why? They're*
> *hearsay.*
> > *Now you got to hear [FL's] testimony because there is a little*
> *exception to that rule when it comes to child sexual abuse.*
> > *But you don't get to hear [ML's] entire interview. You don't get to*
> *hear her recorded interview. She has to take the stand. She has to take the*
> *stand.*

2 RP (Mar. 31, 2023) at 732-33 (emphasis added). Defense counsel did not object.

The State continued, by discussing defense counsel's argument that the lead

detective should have obtained a search warrant for DNA. It argued that the long

time-lapse would have precluded law enforcement from getting one.

> *A court wouldn't have granted him a search warrant for DNA in this bed.*
> Months, at least two to three months had gone by. You think a judge is
> going to grant a search warrant to get into someone's bedroom? It's his own
> bed. Do you think his DNA is going to be in that bed? It's his bed. You
> think his own semen's going to be in his bed? He admits to sleeping with
> her in his bed, do you think her DNA may have been in his bed? Do you
> think he probably—this man, who was the most cleanliness person in this
> whole entire group did not clean his sheets for the past three months? *No*
> *judge would have granted a search warrant for DNA. But he didn't ask*

10

> *that of [the detective] because he knew the answer. And to argue to you that
> is not appropriate. Or legal.*

2 RP (Mar. 31, 2023) at 733-34 (emphasis added).

Castro's counsel objected to the search warrant comment, The court sustained

this objection and instructed the jury to disregard the legal conclusion made by the State.

After reminding the jury that closing arguments are not evidence, the State argued

that some of the arguments made by defense counsel were not true, but the testimony by

FL was true.

> *The defense further told you that, hey, you didn't hear from
> psychologists and therapists and all these other people that could have
> come here to court. I would submit to you that's also an inappropriate
> argument to make based on the rules of evidence. Not admissible.*

2 RP (Mar. 31, 2023) at 735 (emphasis added). The court overruled the objection of

Castro's counsel to this last argument.

The State concluded, "Based on all the evidence, ladies and gentlemen, I would

ask that you find the defendant guilty as charged." 2 RP (Mar. 31, 2023) at 736.

*Verdict*

The jury found Castro guilty on all counts. The trial court sentenced Castro to an

exceptional sentence above the standard range. The court also imposed a $500 CVPA.

Castro appeals.

No. 39849-8-III
*State v. Castro*

ANALYSIS

*Prosecutorial misconduct*

Castro contends the State committed misconduct during closing argument by

(1) appealing to the passions and prejudices of the jury, (2) calling Castro a liar,

(3) vouching for its own witnesses, and (4) attacking defense counsel. He argues that the

improper arguments require a reversal of his convictions. We disagree.

LEGAL PRINCIPLES

"The Sixth Amendment to the United States Constitution guarantees a defendant a

fair trial but not a trial free from error." *State v. Fisher*, 165 Wn.2d 727, 746-47, 202 P.3d

937 (2009). A prosecutor's misconduct may deprive a defendant of their right to a fair

trial. *State v. Davenport*, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984). The defendant bears

the burden of proving the prosecution's conduct was both improper and prejudicial.

*Fisher*, 165 Wn.2d at 747. This court reviews the challenged conduct "in the context of

the whole argument, the issues of the case, the evidence addressed in argument, and the

instructions given to the jury." *State v. Scherf*, 192 Wn.2d 350, 394, 429 P.3d 776 (2018).

If a defendant objected, they must demonstrate that "the prosecutor's misconduct

resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." *State

v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If the defendant did not object,

12

relief on appeal requires the defendant to show that the prosecutor's actions were

"so flagrant and ill intentioned that an instruction could not have cured the resulting

prejudice." *Emery*, 174 Wn.2d at 760-61. "Reviewing courts should focus less on whether

the prosecutor's misconduct was flagrant or ill intentioned and more on whether the

resulting prejudice could have been cured." *Emery*, 174 Wn.2d at 762.

"In all criminal matters, the State carries the burden to prove each element of the

crime charged beyond a reasonable doubt. The jury's role is to weigh the evidence to

determine whether the State has met its burden. This task is independent of whether the

jurors think any witnesses are lying or telling the truth." *State v. Crossguns*, 199 Wn.2d

282, 297, 505 P.3d 529 (2022) (citations omitted). "The jury's job is not to determine the

truth of what happened . . . . Rather, a jury's job is to determine whether the State has

proved the charged offenses beyond a reasonable doubt." *Emery*, 174 Wn.2d at 760.

Attorneys are given wide latitude to make reasonable inferences based on the facts

presented at trial, "including evidence respecting the credibility of witnesses." *State v.*

*Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). However, a prosecutor commits

misconduct by improperly vouching for the credibility of a witness. *State v. Robinson*,

189 Wn. App. 877, 892-93, 359 P.3d 874 (2015). "Vouching may occur in two ways: the

prosecution may place the prestige of the government behind the witness or may indicate

that information not presented to the jury supports the witness's testimony." *State v. Coleman*, 155 Wn. App. 951, 957, 231 P.3d 212 (2010). "A prosecutor places the prestige of [their] office behind a witness when they express a personal belief in the veracity of testimony." *State v. Stotts*, 26 Wn. App. 2d 154, 167, 527 P.3d 842 (2023) (citing *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 706, 286 P.3d 673 (2012) (plurality opinion)).

To constitute vouching, it must be "'clear and unmistakable'" that the prosecution is expressing a personal opinion rather than making an inference from the record. *State v. McKenzie*, 157 Wn.2d 44, 54, 134 P.3d 221 (2006) (emphasis omitted) (quoting *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)). "To determine whether the prosecutor is expressing a personal opinion about the defendant's guilt, independent of the evidence, we view the challenged comments in context." *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009); *see McKenzie*, 157 Wn.2d at 53.

It is improper for a prosecutor to appeal to the passions and prejudices of the jury or reference prejudicial allusions outside of the evidence. *State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988). Argument that "exhorts the jury to send a message to society about the general problem of child sexual abuse" is an improper emotional appeal. *State v. Bautista-Caldera*, 56 Wn. App. 186, 195, 783 P.2d 116 (1989) (emphasis

14

omitted). The State may properly reference "the heinous nature of a crime and its effect

on the victim." *State v. Claflin*, 38 Wn. App. 847, 849-50, 690 P.2d 1186 (1984).

"It is improper for the prosecutor to disparagingly comment on defense counsel's

role or impugn the defense lawyer's integrity." *Thorgerson*, 172 Wn.2d at 451.

### CASTRO'S ASSERTIONS

Castro claims the prosecuting attorney improperly discredited him. He also claims

the State called him a liar. He contends the statements created the perception that people

accused of child rape would say anything to be freed.

First, our review of the record discloses that the State did not call Castro a liar.

It did argue why some of Castro's arguments lacked credibility and it did assert the

arguments were a lie, preposterous, or ridiculous. There is a difference between an

ad hominem attack and an argument that attacks the believability of a story. The State,

perhaps inartfully, did the latter. This case is akin to *State v. Copeland*, 130 Wn.2d 244,

291-292, 922 P.2d 1304 (1996), where the Supreme Court stated, "Significantly, the

prosecutor did not simply call Copeland a liar. Instead, his comments were related to the

evidence and drew inferences that Copeland lied because his testimony conflicted with

that of other witnesses."

15

Second, Castro contends the State, in discussing the discrepancy in Castro's statements about not having a cat, improperly disparaged him. We disagree. At trial, Castro testified that he did not have a cat. When presented with his prior inconsistent statement to the detective that he did have a cat, Castro said his mom had a cat and that it stayed in her room. The State, in closing, argued, "You have to lie about [it]." 2 RP (Mar. 31, 2023) at 717. Again, this inartful argument referenced a way the jury could assess Castro's credibility.

Next, Castro argues the State improperly called his testimony regarding his alleged medical condition ridiculous and ludicrous. This argument related to Castro testifying about his impotency that he believed was caused by a heart attack or a stroke. Castro had never mentioned this condition to the detective when he was interviewed in 2017. The prosecutor stated it was "preposterous" and "ludicrous" that Castro would not tell the detective about his medical condition at the time of the interview, and then stated, "There is zero credibility with his testimony. But that's what you do. That's what you have to say when you are caught. You have to come up with the most ridiculous lie." 2 RP (Mar. 31, 2023) at 719.

In *Anderson*, 153 Wn. App. at 430-31, we declined to conclude that the prosecutor's closing argument, where they characterized the defendant's comments as

"'made up on the fly,'" "'ridiculous,'" and "'utterly and completely preposterous,'" constituted serious and prejudicial conduct. Here, we follow *Anderson* and conclude that the State argued to the jury why it should find Castro's testimony lacked credibility. The State made these arguments based on reasonable inferences from the record.

Castro additionally contends the prosecution improperly vouched for the truthfulness of its own witnesses on numerous occasions during closing argument. He points to five instances where the State vouched for witnesses. Again, we disagree.

Castro appears to claim these statements fall under both types of vouching, yet he provides no support for either. The passing treatment of an issue or the lack of reasoned argument is insufficient to merit judicial consideration. *State v. Min Sik Kim*, 7 Wn. App. 2d 839, 842 n.1, 436 P.3d 425 (2019); *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012). We do not consider Castro's arguments on this issue, except as follows.

Castro, in his rebuttal brief asserts that, "Under the State's theory, if [FL] was telling the truth then [ ] Castro was guilty of the crimes charged—and here the State asserted [FL] told the truth." Reply Br. of Appellant at 24. These arguments mischaracterize the State's argument.

Indeed, asking the jury to reach its verdict based on who it believes is lying or telling the truth is misconduct. *Crossguns*, 199 Wn.2d at 297; *see Emery*, 174 Wn.2d at 760. The role of the jury is to weigh the evidence to determine whether the State met its burden of proving each element of the crime charged beyond a reasonable doubt. *Crossguns*, 199 Wn.2d at 297. "This task is independent of whether the jurors think any witnesses are lying or telling the truth." *Crossguns*, 199 Wn.2d at 297; *see State v. Lindsay*, 180 Wn.2d 423, 434, 326 P.3d 125 (2014).

But asking the jury to determine whether it believes a witness is telling the truth for credibility purposes is not misconduct. "Whether a witness has testified truthfully is entirely for the jury to determine." *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010) (plurality opinion).

In one instance, and while responding to the defense counsel's statements on FL's testimony in rebuttal, the prosecutor said, "The defense stood up here and said why did [FL] say these things? We don't know. Maybe we don't know. You know why [FL] said these things? Because they are true. That's why she said them. And she said them to somebody who made her feel safe." 2 RP (Mar. 31, 2023) at 735.

Castro cites to *Crossguns*, where a child alleged her father had sexually abused her and, similar to this case, the outcome relied heavily on the credibility of the witnesses.

18

199 Wn.2d at 286-89. In closing argument the State said, "'It's your job to determine who's lying. Is [R.G.M.] lying or is [S.R.] lying? And that's your job entirely.'" . . . "'Somebody's not telling the truth, and, again, you're going to have to make that decision. Who is lying and who is telling the truth.'" *Crossguns*, 199 Wn.2d at 288-89 (alterations in original). During rebuttal, the prosecution urged the jury to find the minor victim was telling the truth. *Crossguns*, 199 Wn.2d at 289. In concluding that these statements misrepresented the jury's role, the court said that any prejudice could have been cured by an instruction had Crossguns timely objected. *Crossguns*, 199 Wn.2d at 298-300.

Castro also cites to *Emery*, where the prosecution argued to the jury that its "'verdict should speak the truth'" and urged it to find the truth of what happened. 174 Wn.2d at 751. The Supreme Court held the truth statements were misconduct because "[t]he jury's job is not to determine the truth of what happened; a jury therefore does not 'speak the truth' . . . ." *Emery*, 174 Wn.2d at 760. However, the misstatements were "'not the type of comments which this court has held to be inflammatory,'" and the court concluded any confusion about the jury's role could have been cured by an instruction had defense counsel objected. *Emery*, 174 Wn.2d at 762-63. (quoting *State v. Brett*, 126 Wn.2d 136, 180, 892 P.2d 29 (1995)).

Here, unlike in *Crossguns* and *Emery*, the prosecutor did not misrepresent the

jury's role, but rather, argued that FL and VW were truthful in the context of determining

their credibility. The State urged the jury to find their testimonies provided credible

evidence to show the State proved the elements of the crimes charged beyond a

reasonable doubt. The State emphasized that the jury's duty was to conclude whether

the State proved the charges beyond a reasonable doubt based on all of the evidence.

The prosecutor reminded the jury of the trial court's instruction on credibility. 2 RP

(Mar. 31, 2023) at 705. It was in this context that the State argued the evidence provided

credible proof to find Castro engaged in sexual contact with FL. Further, these arguments

did not constitute vouching.

In arguing that the wrist movement made during FL's forensic interview was

a body sensory memory, the State argued it was an inference from the evidence.

This argument was proper.

APPEAL TO PASSION AND PREJUDICE

Castro claims the prosecutor committed misconduct when she argued, "I bet

that there are some people in this community that would rather be accused of killing

somebody, murdering somebody than raping a kid. Yeah." 2 RP (Mar. 31, 2023) at 718.

She followed that statement soon after by stating, "[T]hat's what you do. That's what

you have to say when you are caught. You have to come up with the most ridiculous lie."

2 RP (Mar. 31, 2023) at 719.

These arguments are improper. They do not relate to any inferences from the evidence. The first comment told the jury that members of its community would characterize child rape as worse than murder. It is wholly inappropriate.[3] However, in the context of the entire record, an instruction could have cured any prejudice.

The second comment told the jury that, when guilty, a person must come up with a ridiculous lie. This argument related to Castro's testimony and is a way for the jury to assess the evidence. We conclude there is no impropriety with this comment.

DISPARAGEMENT OF DEFENSE COUNSEL[4]

Castro claims the prosecution committed misconduct during rebuttal by attacking

---

[3] We note that Castro argues this comment was an improper appeal to passions and prejudice because of the use of the phrase "'raping a kid.'" Br. of Appellant at 35-37. We reject the contention that this specific language is inappropriate or prejudicial since the statutory name of the crime charged with is "rape of a child." RCW 9A.44.073. The use of this term did not improperly appeal to the passions of the jury.

[4] Castro additionally claims the prosecutor's statements placed Castro on the "wrong" side of the law, and the State on the "right" side. Br. of Appellant at 29-30. He cites to no Washington cases, and only to two federal cases, *United States v. Young*, 470 U.S. 1, 8-11, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985), and *United States v. Frederick*, 78 F.3d 1370, 1379-80 (9th Cir. 1996). Neither case supports his claim and we reject it.

defense counsel, making arguments not grounded in evidence, and placing Castro on the

wrong side of the law and the State on the right side when it: (1) held the "ethics" book

up to the jury, argued defense counsel's arguments were improper and illegal and said,

"He knows that is wrong" and (2) said, "Now you got to hear [FL]'s testimony because

there is a little exception to that rule when it comes to child sexual abuse," 2 RP (Mar. 31,

2023) at 732-33; (3) asserted that no court or judge would have authorized a search

warrant for Castro's bed; and (4) told the jury that defense counsel's statements, noting

the absence of testimony from other psychologists or therapists, was not permitted under

the rules of evidence and was an inappropriate argument. Castro contends all of these

arguments during closing created the image that defense counsel would violate his ethical

obligations and say anything to win. These arguments are the most troubling.

In reviewing these arguments, we first look at the latter two. Castro's counsel

objected to them. The trial court sustained the objections and instructed the jury to

disregard them.[5] Unless there is evidence to the contrary, jurors are presumed to follow

the court's instructions. *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). In

the present case, not only is there no evidence to overcome this presumption, but Castro

does not argue there is any. Accordingly, we presume the jury disregarded these improper

---

[5] We note that the defendant has not assigned error to these trial court rulings.

arguments, and Castro's contentions on these last two arguments fail.

As to the first two arguments made by the State, defense counsel did not object. We conclude that although these arguments are improper, and did disparage defense counsel, any resulting prejudice could have been cured by an instruction to the jury.

The State's arguments regarding the "ethics" book clearly sends a message that defense counsel acted unethically, and that he did so intentionally. It was an *ad hominem* attack on counsel, and not an inference to any evidence. When the State immediately followed up this argument by telling the jury that they heard evidence because of the evidence rules, it further disparaged defense counsel. It is the juxtaposition of this argument with the first statement that makes it improper.

Although we conclude that the State's arguments were improper, Castro did not object to them and thus waived the issue unless he can show the comments were so flagrant and ill intentioned that no instruction could have cured them.

In *State v. Warren*, the prosecutor argued there were "'a number of mischaracterizations'" in defense counsel's argument and described the argument as a "'classic example of taking these facts and completely twisting them to their own benefit, and hoping that you are not smart enough to figure out what in fact they are doing.'" 165 Wn.2d 17, 29, 195 P.3d 940 (2008), *cert. denied sub nom. Warren v. Washington*,

23

556 U.S. 1192 (2009). These arguments were held to be improper comments on defense counsel's role. *Warren*, 165 Wn.2d at 29-30. However, the Supreme Court held the arguments were not so flagrant and ill intentioned that an instruction could not have cured them. We have independently reviewed the record here, and determine that Castro has failed to show any prejudice engendered by these comments could not have been cured by an instruction to the jury.

We must address the State's arguments. Although the State concedes the prosecutor criticized the defense attorney directly with regard to the "ethics" book comments, it argues that it only did so in response to his inappropriate closing remarks that highlighted the absence of any recorded interviews other than FL's in evidence. The State relies on the "fair response" rule referred to in *State v. Russell*, 125 Wn.2d 24, 86-88, 882 P.2d 747 (1994).[6]

We reject this contention by the State. It claims to be responding to inappropriate

---

[6] In *Russell,* the Supreme Court held that "[r]emarks of the prosecutor, even if they are improper, are not grounds for reversal if they were invited or provoked by defense counsel and are in reply to [their] acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective." 125 Wn.2d at 86. While "[a] prosecutor may not suggest that evidence not presented at trial provides additional grounds for finding a defendant guilty," a prosecutor is entitled to fairly respond to the defense's arguments and may argue that the evidence does not support the defense's theory. *Russell*, 125 Wn.2d at 87.

arguments by defense counsel; however, it must be remembered that the State objected to those arguments. The trial court not only sustained the objections, but instructed the jury to disregard the argument. It is illogical and unreasoned for the State to now argue that it was responding to comments that the court had stricken and had instructed the jury to disregard. In addition, it is clear that the "fair response" rule does not allow personal attacks on defense counsel.

*CVPA*

Castro challenges the trial court's imposition of the CVPA, arguing that recently amended statutes prohibited it. The State concedes. We accept the State's concession and remand for the trial court to strike the CVPA.

STATEMENT FOR ADDITIONAL GROUNDS FOR REVIEW (SAG)

Castro states two additional grounds upon which relief should be granted. First, he claims the prosecution and the trial court expressed bias and prejudice throughout his case. Second, he claims he received ineffective assistance of counsel. We disagree.

*1. Bias and prejudice*

Castro alleges the prosecution and trial court expressed bias and prejudice throughout his case on several different occasions: First, the prosecutor addressed the alleged victim as "'victim'" throughout the motions and proceedings. SAG at 1. Second,

on December 15, 2022, and "other dates", the prosecutor objected to the witness being interviewed. SAG at 1. Third, on October 25, 2018, the prosecutor stated, "I understand that the wheels of justice don't always work." SAG at 2 (quoting 1 RP (Oct. 25, 2018) at 9). Fourth, on January 26, 2023, the prosecutor indicated the need to rush to trial knowing that Castro's attorney at the time was going to leave the public defender's office. Fifth, on March 2, 2023, the prosecutor said she would send the witness list by e-mail to Castro's attorney but did not do so. Sixth, on March 20, 2023, Castro's attorney was again denied a motion to continue the trial, and the prosecutor and the judge addressed the alleged victim as "'victim,'" giving leverage to State. SAG at 2 (quoting 1 RP (Mar. 20, 2023) at 33, 36, 38-41. And seventh, on August 8, 2019, a DVD of FL's forensic interview submitted to Castro's counsel was noted by counsel to be blank. S*ee* 1 RP (Aug. 8, 2019) at 20.

First, Castro failed to preserve an objection to the prosecutor addressing FL as the "victim." We do not review this claim. RAP 2.5(a).

Second, it is the roll of a zealous advocate to object to witness testimony or questions asked to a witness that counsel believes are improper. Castro provides no evidence suggesting the prosecution improperly objected, or how these incidents affected his verdict.

Third, the prosecutor's statements on October 25, 2018, were stated prior to the start of his trial. The jury did not hear the statements, and there is no evidence they affected the verdict. Regardless, they were not objected to and should not be reviewed on appeal.

Fourth, by January 26, 2023, Castro's trial had been pending for almost six years after numerous continuances. At the hearing, the State urged the court to keep the trial date and deny another continuance, highlighting the fact that FL was now 13 years old, there had already been multiple attorneys assigned to Castro's case, and many witnesses no longer lived at the same addresses. Knowing that defense counsel was going to be leaving the public defender's office soon, the State wanted to keep the trial date so that the trial would occur before defense counsel was gone. No prejudice has been shown.

Fifth, the transcript of the March 2, 2023, hearing does not reflect the prosecutor said she would send the witness list by e-mail to defense counsel. The remainder of the contention is outside the record on review.

Sixth, on March 20, 2023, Castro's attorney was again denied a motion to continue the trial, and the prosecutor and the judge addressed the alleged victim as "victim." See 1 RP (Mar. 20, 2023) at 33, 36, 38-41. This issue was not objected to and is not preserved for appeal. RAP 2.5(a). Further, at the March 20, 2023, hearing, defense counsel

27

requested a continuance because they had another trial to prepare for. The trial court inquired into the other case and the State told the court they had been in contact with the prosecution in the other case and they were willing to make arrangements so that Castro's case could proceed to trial as scheduled. There is no showing of prejudice or bias.

Seventh, on August 8, 2019, the DVD submitted to counsel was blank. No prejudice has been shown.

Castro's claims fail on this ground.

*2. Ineffective assistance of counsel*

To be entitled to relief on an ineffective assistance claim, Castro must show both (1) deficient performance and (2) prejudice; and failure to meet either prong precludes relief. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

We have reviewed the six instances where Castro claims ineffective assistance of counsel. We reject his contentions.

## CONCLUSION

We remand to the trial court for it to strike the CVPA, but otherwise affirm the convictions.

No. 39849-8-III
*State v. Castro*


A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Melnick, J.P.T.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Cooney, J.

29